# Exhibit I

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF SAN FRANCISCO

3                      ---o0o---

4

5    GEARY SHA, an individual;

6              Plaintiff,

7       vs.                                Case No.
                                           CGC-23-606989
8
     AIRCRAFT SERVICE
9    INTERNATIONAL, INC.,
     a Delaware Corporation;
10   MENZIES AVIATION (USA), INC.,
     a Delaware Corporation;
11   TRACY AGUILAR, an individual;
     and DOES 1 through 50, inclusive;
12

13              Respondents._____/

14

15

16              VIDEOTAPED DEPOSITION OF

17                   GEARY SHA

18               VALLEJO, CALIFORNIA

19            TUESDAY, FEBRUARY 6th, 2024

20                   VIA ZOOM

21

22

23   Reported by:

24   Tamra Elaine Keen, RPR, CLR, CCRR, CSR No. 5404

25   Job No.: 10134914

1    Aircraft Service International, Inc., Menzies Aviation,

2    USA, and Tracy Aguilera, who was erroneously named as

3    Tracy Aguilar in the Complaint, and with me is one of my

4    associates, Will Lawther, who will be appearing at the

5    deposition today.

6            MR. BROTMAN:  Good morning.  My name is Gary

7    Brotman.  I represent the plaintiff in this matter, the

8    deponent, Geary Sha.  Along with me is my one of my

9    associates, Diego Gallego Gomez.  He will be observing,

10   as well.

11           MS. RAMSE:  The court reporter today is Tamra

12   Keen and she may now swear in or affirm the deponent.

13                     GEARY SHA,

14       having been duly sworn, testified as follows:

15                     EXAMINATION

16           MR. JACKSON:  Thank you.

17           Good morning Mr. Sha.

18           My name is Kevin Jackson.  I introduced myself

19   a few times.  I represent the defendants in this case,

20   Aircraft Service International, Inc., you may know as

21   ASIG Menzies Aviation USA and a Tracy Aguilera.

22       **Q.   Are you able to hear me okay?**

23       A.   Yes.

24           Are you guys able to hear me okay?

25       **Q.   I can hear you great, thank you.**

Geary Sha

Geary Sha vs.
Aircraft Service International, Inc., et al.

1    Q.    Yeah.

2         During your time as general manager, were you

3    involved in decisions relating to, you know, staffing,

4    job assignments, organization of departments, things

5    like that?

6         A.    During the time, I just -- I consulted with my

7    duty managers that's out on the field, to understand and

8    go out there and observe, you know, what they tell me is

9    called for, to make a judgment in regards to what --

10   what -- what decision needs to be made.

11        Q.    In the situations that you identify where you

12   were involved in the decision-making process to

13   terminate the employment of, it sounds like, two

14   individuals, can you describe what that process was

15   like?

16        A.    One of the issues that led to termination of

17   one of the employees was an FAA violation, where they

18   call it "blocking the deadman".

19             A deadman is a switch that controls or

20   activates a pump.  Blocking it requires, you know,

21   jamming a piece of wire, whatsoever, so it keeps on --

22   keeps on, basically.  And FAA rules that's a violation

23   and it's a terminal offense.  So that's pretty much --

24   pretty much self-explanatory.

25             Tracy -- I was working with Tracy in regards

1    to that to get all the documentation.  I got CCPD

2    footage from the tank farm, the fuel farm itself,

3    when --

4              (Reporter requests clarification.)

5    BY MR. JACKSON:

6         Q.    Is that Tracy Aguilar?

7         A.    That's Tracy Aguilera.

8         Q.    I'm sorry, Tracy Aguilera.

9         A.    You confused me, as well.

10        Q.    The same -- the same Tracy you were just

11   discussing, that's the same Tracy Aguilera who is the

12   defendant in this case; correct?

13        A.    Correct.

14        Q.    And so it sounds like you had -- with respect

15   to that termination -- an opportunity to work directly

16   with Tracy in connection with that personnel decision?

17        A.    Right.

18        Q.    And what was your opinion of Tracy's, you

19   know, professionalism when it came to assisting in that

20   termination decision?

21             MR. BROTMAN:  Objection calls for speculation,

22   calls for a legal conclusion.

23             THE WITNESS:  So when that had happened, Tracy

24   gave me recommendations of what -- what could we do.

25   She also put on a side note that is there any way we can

Geary Sha

1    save this employee.  Because one, this employee that was

2    getting terminated was a shop union rep for the company.

3              And I pretty much had to follow by the rules

4    of, you know, FAA violations is FAA violations.  You

5    know, you have too many parties that's involved with

6    this.  You have the fuel farm -- fuel farm general

7    manager, which is -- is one that provide me CCTB and

8    every time those incidents got to be reported to FAA so

9    they know what's going on.

10             I made a judgment call of there's no way we

11   can save this individual.  So therefore, the termination

12   stands.

13   **Q.   Okay.  And in your opinion, was -- did Tracy**

14   **handle that decision-making process in a fair manner?**

15             MR. BROTMAN:  Objection calls for speculation,

16   vague and ambiguous as to "fair", calls for expert

17   opinion.

18             THE WITNESS:  So Tracy basically just had to

19   process everything that I told her.  Because at the end

20   of the day, I am in charge of this station.

21             MR. JACKSON:  Okay.  So when you were working

22   with Tracy for that termination, ultimately it was your

23   decision and Tracy had to do what you instructed her to

24   do.

25   **Q.   Is that your testimony?**

Page 91

1        A.    Correct.

2        Q.    Okay.  And so then after that, if Tracy

3   communicated the decision to the employee, she would be

4   communicating what presumably you had guided her to do;

5   is that correct?

6             MR. BROTMAN:   Objection assumes facts,

7   incomplete hypothetical.

8             THE WITNESS:   Can you rephrase that?

9             MR. JACKSON:   Let me ask a different question.

10       Q.   Did you -- when the termination decision was

11  made, who communicated that decision to the employee, to

12  your knowledge?

13       A.   So after we have a meeting with Tracy, what is

14  there to do in the process?

15       Q.   Yeah, what happened.  How did the employee

16  come to learn that he or she had been terminated?

17       A.   We had a meeting with the individual, and we

18  sat the individual down and explained to them, you know:

19  This is the rules.  We are basing your termination off

20  on this -- what you call the evidence that we have at

21  hand.

22       Q.   And who attended that meeting?  I don't know

23  the name of this employee, was but was it you and Tracy?

24       A.   Me, Tracy, and one other shop rep.

25       Q.   Okay.  And in that meeting, you said you were

Geary Sha

Geary Sha vs.
Aircraft Service International, Inc., et al.

1    basically -- everything you just said you were

2    communicating to the employee about the reasons for the

3    decision and the rules about why the company did what it

4    did?

5         A.   Right.

6         Q.   Is that correct?

7         A.   Correct.

8         Q.   Did Tracy communicate any of the same to the

9    employee, or was it just you?

10        A.   We both did.  We were both at that meeting

11   when the final decision.

12        Q.   Okay.  And in your view, were those

13   communications made in the ordinary course of performing

14   your jobs as managers for Menzies?

15        A.   I'm sorry?

16        Q.   So the meeting you just described where you

17   and Tracy were communicating the company's termination

18   decision to the employee, do you agree that that was

19   just part of your and Tracy's job, was to communicate

20   Menzies' decision to the employee at that meeting?

21        A.   Yes.

22        Q.   You would agree that that's just an ordinary

23   function that a manager in your position and in Tracy's

24   position performed for Menzies?

25        A.   Yes.

1    MR. BROTMAN:  Objection compound, calls for

2    speculation.

3    BY MR. JACKSON:

4    Q.   You said you communicated a lot to the

5    employee during that meeting, but in your mind was your

6    decision to terminate the employee based on company

7    policy?

8    A.   Yes.

9    Q.   And ultimately, did you come to the opinion

10   that Tracy agreed with your decision that termination

11   was justified, based on company policy?

12   MR. BROTMAN:  Objection calls for speculation

13   as to what Tracy thought.

14   THE WITNESS:  Was this the final meeting with

15   the employee, or just a meeting that I have with Tracy

16   and the training managers?

17   BY MR. JACKSON:

18   Q.   I was just referring to the termination

19   meeting we were just talking about?

20   A.   If you are talking about the termination with

21   the employee happened with the final meeting with them.

22   Yes, its my position, based on all the evidence I

23   gathered, and the company policy and the FAA violation,

24   as well.

25   MR. JACKSON:  Okay.

Geary Sha vs.
Aircraft Service International, Inc., et al.

Geary Sha

1    break we were talking about, I believe, the -- Exhibit 6

2    was the February 10th, 2022 email; right?

3        A.    Right.

4        Q.    And we were talking about before that time, in

5    connection with your employment and position as the

6    general manager, you would have some occasion to work

7    directly with Tracy Aguilera with respect to at least

8    one termination decision.

9            Is that correct?

10       A.    Two.  A total of two, that I remember.

11       Q.    Two.

12            Can you describe the other termination that we

13    talked about earlier and you anymore interactions with

14    Tracy in connection with that?

15       A.    The other termination was due to attendance

16    issues of personnel.  Nothing against his, what you say,

17    personality.  It was more his absence or tardiness

18    affecting our operations and pretty much trying to

19    follow the company policy in regards to the attendance

20    policy was adhered and made a decision to, you know,

21    terminate this employee based on cause.

22       Q.    Was that your decision?

23       A.    Yes, following company policy, attendance

24    policy.

25       Q.    And --

Geary Sha                                    Geary Sha vs.
                                 Aircraft Service International, Inc., et al.

1        A.   And there was --

2        Q.   Go ahead.

3        A.   -- there was a time that I have meetings with

4   Tracy and, also, during that time, with the training

5   manager as well, to discuss about --

6             (Reporter requests clarification.)

7             THE WITNESS:  Discuss about that employee

8   that's going to be terminated.

9             Tracy was asking:  Is there anything we can do

10  to save this individual?

11            I told Tracy straight up:  Adhering with the

12  company's attendance policy, this guy violated a lot of

13  issues and, you know, I made the decision to let him go.

14  BY MR. JACKSON:

15        Q.   And then, did you instruct Tracy to proceed

16  with processing the termination based on your decision?

17        A.   Correct.

18        Q.   And did she fulfill your requests?

19        A.   Yes.

20        Q.   And in fulfilling your requests, do you agree

21  that that was part of what her job function in Human

22  Resources required her to do?

23            MR. BROTMAN:  Objection may call for

24  speculation.

25            THE WITNESS:  Yes.

**Page 98**

Geary Sha

Geary Sha vs.
Aircraft Service International, Inc., et al.

1    BY MR. JACKSON:

2        Q.   And did you then, or sitting here now, take

3    any issue with how Tracy performed her Human Resources

4    function in connection with that termination?

5        A.   Before the termination she was asking, you

6    know:  Can we give each of them a second chance?

7             And she knows that there is no second chances

8    to be given.

9        Q.   Okay.  So she was looking for a way to give

10   the employee a second chance, and you said no, and then

11   instructed her to proceed with the termination.

12            Is that correct?

13       A.   Correct.

14       Q.   And so, in so processing that termination and

15   in your view, Tracy was doing what she was supposed to

16   do, based on your direction to her; correct?

17       A.   Right.

18            MR. BROTMAN:  Objection mischaracterizes prior

19   testimony.

20            Give me a second, Geary, before you answer.

21            (Reporter requests clarification.)

22   BY MR. JACKSON:

23       Q.   Can you answer the question, please?

24       A.   Can you repeat that again, I'm sorry.

25            MR. JACKSON:  Can we have the question read

1   medical condition?

2        A.   That, I don't recall.

3        Q.   Did you have -- strike that.

4             Prior to February 10th, 2022, did you have any

5   communications with Tracy Aguilera about your need to

6   have time off to have surgery?

7        A.   I don't recall.

8        Q.   To the best of your recollection, is the only

9   person you spoke with at Menzies about your need for

10  time off in February 2022, was that Kevin Lager?

11       A.   Yes, because he was the boss.  Tracy doesn't

12  have anything to do with decision-making, whatsoever.

13  Kevin is the one that has the decision-making.

14       Q.   All right.

15            With respect to granting time off?

16       A.   Yes, to make sure that everything -- I'm

17  sorry.

18       Q.   To --

19       A.   To make sure that everything is covered.  I

20  even got text message for him -- from him saying, you

21  know:  Hope everything is okay.  Speedy recoveries.  I

22  wish you back soon.

23            MR. JACKSON:  Okay.

24            Introduce as Exhibit 7, an email dated

25  February 15th, 2022, which is Bates marked Menzies Sha

1      Q.   And the letter said that and you understood

2   that at the time; correct?

3      A.   Yes.

4      Q.   It goes on to state:  Upon the expiration of

5   the leave, you may be returned to your former position

6   based on business needs and availability.

7           Correct?

8      A.   Yes.

9      Q.   So at the time you received this letter in

10  April of 2022, was it your understanding that, starting

11  on May 7th, you would be on a non-FMLA/CFRA leave, that

12  did not have job protection rights and that you will

13  return to your former position was not guaranteed?

14     A.   Yes.

15     Q.   Okay.  And again it's your testimony that, at

16  this time that you were receiving this email, you were

17  taking no issue with how Menzies responded to your

18  requests for time off or classified your requests for

19  time off; correct?

20     A.   Correct.

21     Q.   And can you identify any statements that

22  anybody at Menzies made in the connection with your

23  request to extend your leave through September 19th,

24  2022, that you found to be inappropriate?

25     A.   No.

1    operational need for the general manager position at

2    SFO.

3        Q.   Is that correct?

4        A.   That's correct.  She said the company finds --

5    she said Michael Porier or company finds that there's no

6    longer a need of a general manager at SFO because they

7    have operation manager, they have additional account

8    manager.

9        Q.   Okay.  And did Tracy say anything to you

10   during that discussion to indicate that Menzies'

11   decision was based on your medical condition?

12       A.   No.

13       Q.   And during that conversation, did Tracy say

14   anything to you to indicate that Menzies' decision was

15   based on your leave of absence?

16       A.   No.

17       Q.   And other than Tracy's statement that the

18   company determined that there was no longer a need for

19   the general manager position, had eliminated it at SFO,

20   did she tell you anything else regarding Menzies'

21   reasons for its decision?

22       A.   No.

23       Q.   Sitting here today, do you know why Menzies

24   made the decision to eliminate the general manager

25   position at SFO?

1      A.   I have no clue.

2      Q.   Are there any -- strike that.

3           Has anybody from Menzies communicated anything

4  to you, in writing or verbally, to contradict the reason

5  that Tracy identified in her meeting with you on

6  December 20th, 2022, as to why Menzies eliminated the

7  general manager position at SFO?

8           MR. BROTMAN:  Objection leading.

9           THE WITNESS:  No.

10  BY MR. JACKSON:

11      Q.   And during this meeting, Tracy informed you

12  for the first time that Menzies had eliminated your

13  position; correct?

14      A.   Yes.

15      Q.   And you identified multiple positions that she

16  informed you were available and currently open at the

17  SFO location where you worked; correct?

18      A.   Yes.

19      Q.   Are you aware of whether there were other

20  positions open at SFO that Tracy did not identify?

21      A.   No.  I only know that there's other positions

22  after the fact that I was gone.

23      Q.   When at the time is it your understanding that

24  Tracy informed you of all available positions at SFO as

25  of December 20th, 2022?

1        MR. BROTMAN:  Objection leading, calls for

2    speculation.

3              You can answer, if you know the answer.

4              THE WITNESS:  I don't know.

5              MR. JACKSON:  Just so I'm clear.

6        **Q.   You have no information to suggest that there**

7    **were other positions open that she concealed from you**

8    **during that meeting on December 20th, 2022; correct?**

9        A.   Not quite sure.  She only gave me those two

10   job listing:  Aircraft fueler and cargo.

11             To me, that does not make sense.

12       **Q.   My question is simp -- my question is simply:**

13   **Other than those two positions, are you aware of whether**

14   **there were other positions available at the SFO station**

15   **as of December 20th, 2022?**

16             MR. BROTMAN:  Objection asked and answered.

17             THE WITNESS:  I don't know.

18   BY MR. JACKSON:

19       **Q.   After Tracy informed you of those two open**

20   **positions, you responded with, you know, what you**

21   **testified to before essentially that they were, you**

22   **know, significantly lower paying and, you know, several**

23   **steps down from the general manager position; correct?**

24       A.   That is correct.

25       **Q.   And then you inquired with her about open**

1  management positions at other locations, other than SFO;

2  correct?

3       A.   Correct.

4       Q.   And then, how did Tracy respond to that

5  request?

6       A.   She draft me a list of what she could find

7  out.  She also mentioned that there is no guarantee, no

8  relocation fee for me, and also gave me a deadline of

9  three days to think about it.  Three days not enough to

10 think about, to talk to my family, to make that move.

11 That's a gamble, too.

12      Q.   Well --

13      A.   And she keep on saying:  So if you don't

14 accept anything, that you voluntarily resign.

15           I straight on told her:  I do not resign and I

16 do not voluntarily resign.

17      Q.   So during the meeting on December 20th, you

18 asked about other positions -- management positions at

19 other locations, and Tracy told you she would look into

20 it and provide you with a list; correct?

21      A.   We only talked on the phone on the 20th, when

22 I was in the office and she is not in the office.  She

23 talked to me remotely.  She didn't even give me a list

24 of the -- of the positions until probably second day,

25 when I emailed her about that.  And she got back to me

1   position after extended leave.  Especially, in my case,

2   in my position as GM.  They just don't leave -- you

3   don't get rid of GM just like that.

4              I'm not a regular agent, which is replaceable.

5        Q.   Okay.  But you understood that Menzies had

6   communicated to you, since prior to ahead of the time

7   your FMLA/CFRA leave had expired in May of 2022, the

8   company was extending your leave of absence pursuant to

9   a medical leave of absence policy that was not job

10  protected.

11             That was communicated to you multiple times;

12  correct?

13       A.   Yes.

14       Q.   Okay.  And looking at this email, do you find

15  this to be an appropriate communication with your

16  employer?

17             MR. BROTMAN:   Objection vague and ambiguous.

18             THE WITNESS:   I believe so.

19  BY MR. JACKSON:

20       Q.   And you understood that Menzies was offering

21  you all of the positions at SFO, to which you responded:

22  This is an insane job offer.

23             Correct?

24             MR. BROTMAN:   Objection mischaracterizes the

25  testimony.

1      Q.   By way of this communication, were you, in

2   your mind, clearly communicating that you would not

3   accept the open positions that were available at SFO?

4      A.   Actually, I accept?

5      Q.   Right.  So you were turning down the work that

6   Menzies informed you was available at this time at SFO;

7   correct?

8      A.   Yes.

9           MR. JACKSON:  I'd like to introduce an Exhibit

10   22, a document Bates stamped Menzies Sha 0000629 through

11   633.

12           (Exhibit 22 is marked for identification.)

13           THE WITNESS:  I received.

14           MR. JACKSON:  Okay.  So looking down at the

15   bottom, there's email that starts underneath 0000631, on

16   the page 632, it looks like.  It starts to

17   gearysha86@gmail.com.  Subject:  Recap of meeting.

18      Q.   Do you see that?

19      A.   Yes.

20      Q.   And it states:  As per your doctor's release,

21   you were scheduled to return to work December 20th,

22   2022.

23           Correct?

24      A.   Yes.

25      Q.   And then it states:  Upon your return, I

1    position in the Menzies network that you can apply and

2    may be considered.

3              Do you see that?

4    A.   Yes.

5    Q.    And is that consistent with your understanding

6    that, after you asked Tracy about other positions, she

7    looked into them, there were more management level

8    across the Menzies network, and then identified four

9    such positions that would be available now?

10   A.   She only sent this after it was requested a

11   week later.  And I had three days from that time to make

12   a decision to see if I can move.  And like I say,

13   there's no relocation funds.  How can that be?

14   Q.   My question was simply:  In response to your

15   requests to look at positions outside of SFO that were

16   more equivalent to the management position you held,

17   Tracy looked at open positions and provided these four

18   in response to your requests.

19              Is that correct?

20              MR. BROTMAN:  Objection asked and answered,

21   again.

22              THE WITNESS:  Yeah.  She only gave me these

23   positions when I asked for it.  It's not offered to

24   me --

25              MR. JACKSON:  I --

1      THE WITNESS:   -- to begin with.

2   BY MR. JACKSON:

3      Q.   I -- my question is simply:  In response to

4   your request, did Tracy identify open positions in the

5   Menzies network that were more equivalent to the

6   management position you held; yes or no?

7            MR. BROTMAN:  Objection asked and answered.

8            Again, harassing at this point.

9            THE WITNESS:  No, I'm telling you.  These

10  are -- these are positions that was not offered to me to

11  begin with.  I had to ask for it.

12           MR. JACKSON:  Sir, my question is not whether

13  you were offered the positions.

14     Q.   My question is whether Tracy identified them

15  as open positions in the Menzies network in response to

16  your request?

17           MR. BROTMAN:  Objection harassing and asked

18  and answered for the fourth time.

19           So -- are you able to hear Geary?

20           THE WITNESS:  Yes, I can hear you now, sorry.

21           So like I was saying, those positions were

22  just offered to me after I have asked for it.  None of

23  those positions was offered to me to begin with.

24           MR. JACKSON:  Okay.  This email identifies,

25  quote:  The list of these job positions and locations.

1    to go back to the Complaint.  If you could please scroll

2    up, this would be Exhibit 3, Tab 16.

3          A.   Once again, I'm trying to --

4          Q.   No problem.

5          A.   Can you name the file name that you shared?

6          Q.   Yeah, it's Tab 16 in the chat.  It says:

7    10:34 a.m.

8          A.   Tab 16, Complaint.

9               And you talked about what line?  I'm sorry.

10          Q.   I just wanted to see if you added it in front

11    of you.

12          A.   Yeah, I have it in front of me.

13          Q.   All right.  I want you to look at paragraph

14    53, please.

15          A.   53.

16               Okay.

17               As described herein --

18          Q.   Yeah.  Okay.

19               Starting on line 24, it states:  Defendants

20    harassed Plaintiff in actions and Aguilar acting in her

21    capacity as agent employed by Menzies repeatedly, one,

22    sought to obstruct plans to return to work.

23               Do you see that?

24          A.   Yes.

25          Q.   And what specifically, in your view,

Geary Sha

Geary Sha vs.
Aircraft Service International, Inc., et al.

1   constituted Tracy's efforts to obstruct your return to

2   work?

3          MR. BROTMAN:   Objection calls for a legal

4   contention, pursuant to writ in the superior court.

5          THE WITNESS:   Well, she word -- used to word

6   "voluntary resignation" every time.  I felt threaten

7   because I don't resign, at all, or voluntarily resign.

8          MR. JACKSON:   Okay.

9      Q.   Other than Tracy's statements about "voluntary

10  resignation", is there anything else that she said that

11  made you feel threatened?

12     A.   No, just only voluntary resignation every

13  time.

14     Q.   And those were written communications that

15  we've looked at today during your deposition?

16     A.   That is correct.

17     Q.   And is it your belief that Tracy made the

18  decision to separate your employment from Menzies?

19     A.   I believe she has to do whatever the boss

20  says; right?  So it is not her decision, but then it is

21  how -- how it was explained to me, I feel threatened.

22  Voluntary resignation.  You voluntary resign.  Which I

23  don't resign.

24     Q.   Do you know whether Tracy was instructed by

25  anybody else to classify your termination as a voluntary

Geary Sha

Geary Sha vs.
Aircraft Service International, Inc., et al.

1    resignation?

2        A.    That, I'm not sure.    We all have different

3    bosses.

4        Q.    But ultimately, it is your testimony that you

5    don't think Tracy was the one that made the decision.

6    She was just performing her job as the Human Resources

7    manager, in communicating with you?

8            MR. BROTMAN:    Objection misstates the

9    testimony.    Leading.

10           THE WITNESS:    Yeah, I don't know.

11   BY MR. JACKSON:

12       Q.    Well, is there any reason for you to believe

13   that she was acting outside of her capacity as a Human

14   Resources manager during her communications with you?

15           MR. BROTMAN:    Objection calls for speculation

16   as to her capacity as a "Human Resources manager".

17           THE WITNESS:    I don't know.

18   BY MR. JACKSON:

19       Q.    Are you familiar with Tracy's complete job

20   description?

21       A.    She handles all the difficulties and all the

22   human relationship with all the employees, so to speak.

23       Q.    And other than that, do you have personal

24   knowledge of specific job duties and responsibilities

25   that Tracy Aguilera holds in her capacity at Menzies?

Geary Sha

Geary Sha vs.
Aircraft Service International, Inc., et al.

```
 1              CERTIFICATE of REPORTER
 2         I, the undersigned, a Certified Shorthand
 3   Reporter of the State of California, do hereby certify:
 4         That the foregoing proceedings were taken before
 5   me at the time and herein set forth; that any witness in the
 6   foregoing proceedings, prior to testifying, were duly sworn;
 7   that a record of the proceedings was made by me using
 8   machine shorthand, which was thereafter transcribed under my
 9   direction; that the foregoing transcript is a true record of
10   the testimony given.
11         Further, that if the foregoing pertains to the
12   original transcript of a deposition in a federal case,
13   before completion of the proceedings, review of the
14   transcript [ X ] was [ ] was not requested.
15         I further certify I am neither financially
16   interested in the action nor a relative or employee of any
17   attorney or party to this action.
18         IN WITNESS WHEREOF, I have this date subscribed
19   my name.
20
21   Dated:  February 15th, 2023
22
23                    _____
24                         Tamra Elaine Keen
25                    RPR, CLR, CCRR, CSR No. 5404
```