Gary Brotman (SBN 287726)
gary@marqueelaw.com
Diego Gallego Gómez (SBN 337395)
diego@marqueelaw.com
MARQUEE LAW GROUP, A Professional Corporation
9100 Wilshire Boulevard, Suite 445 East Tower
Beverly Hills, California 90212
(310) 275-1844 telephone
(310) 275-1801 fax

Attorney for Plaintiff
GEARY SHA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEARY SHA, an individual;<br><br>          Plaintiff,<br>    vs.<br><br>AIRCRAFT SERVICE INTERNATIONAL, INC., a Delaware corporation; MENZIES AVIATION (USA), INC., a Delaware Corporation; TRACY AGUILERA, an individual; and DOES 1 through 50, inclusive.<br><br>        Defendants. | United States District Court<br>Case No.: 3:24-cv-01738-EMC<br><br>San Francisco Superior Court<br>Case No.: CGC-23-606989<br><br>**DECLARATION OF GARY S. BROTMAN IN SUPPORT OF PLAINTIFF'S MOTION TO REMAND CASE**<br><br>Date: June 13, 2024<br>Time: 1:30 p.m.<br>Judge: Honorable Edward M. Chen<br>Location: Phillip Burton Federal Building |

-1-
**DECLARATION OF GARY S. BROTMAN IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND CASE**
Case No. 3:24-cv-01738-EMC

### DECLARATION OF GARY S. BROTMAN

I, GARY S. BROTMAN, declare:

 1. I am an attorney at law, duly admitted to practice before the Courts of the State of California as well as this Court. I am a member of Marquee Law Group, APC, attorneys for Plaintiff Geary Sha ("Plaintiff"). I have personal knowledge of the matters set forth herein, and if called and sworn as a witness, I could and would competently testify with respect thereto.

 2. I submit this declaration in support of Plaintiff's Motion to Remand Case.

 3. Attached hereto as **Exhibit A** is a true and correct copy of a February 9, 2024 email from Aptus providing my office with the rough draft transcript of Defendants' deposition of Plaintiff.

 4. Attached hereto as **Exhibit B** is a true and correct copy of an April 17, 2024 email from Aptus stating that Aptus provided Defendants' counsel with the rough draft transcript of Defendant's deposition of Plaintiff on February 8, 2024 at 12:12 p.m.

 5. Attached hereto as **Exhibit C** is a true and correct copy of excerpts from the rough transcript that match the same excerpts from the certified transcript utilized by Defendants as Exhibit I in their Notice of Removal.

 6. Attached hereto as **Exhibit D** is a true and correct copy of emails between Defendants' counsel and me, in which I requested to depose Defendants' Person Most Knowledgeable beginning in December 2023, which Defendants have continuously obstructed to the present.

 I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on this 19th day of April 2024, in Beverly Hills, California.

    __/s/ Gary S. Brotman_____

    Gary S. Brotman

**DECLARATION OF GARY S. BROTMAN IN SUPPORT OF PLAINTIFF'S NOTICE OF MOTION AND MOTION TO REMAND CASE**

Case No. 3:24-cv-01738-EMC

# EXHIBIT A




## Job No. 10134914 Geary Sha 2/7/24 Rough Draft

**aboyadzhyan@aptuscr.com** <clientservices@aptuscr.com>　　　　　Fri, Feb 9, 2024 at 11:56 AM
Reply-To: clientservices@aptuscr.com
To: Tamra Keen <tkeencsr@gmail.com>, "diego@marqueelaw.com" <diego@marqueelaw.com>
Cc: "gary@marqueelaw.com" <gary@marqueelaw.com>

Hello Counsel,

Please see rough attached.

Best Regards,



**Alisa Boyadzhyan**
**Client Services Specialist**
Aptus Court Reporting

**Phone:** 866.999.8310
**Web:** www.aptuscr.com
**Schedule:** scheduling@aptuscr.com





[Quoted text hidden]

📄 **Job No. 10134914 Sha, Geary 2-6-24 ROUGH.txt**
　　319K

# EXHIBIT B




## Fwd: [SchedulingDistro] Re: Help Contacting Court Reporter

1 message



From: **aboyadzhyan@aptuscr.com** <clientservices@aptuscr.com>
Date: Wed, Apr 17, 2024 at 4:35 PM
Subject: Re: [SchedulingDistro] Re: Help Contacting Court Reporter
To: Starr Jarrard <sjarrard@aptuscr.com>, Gary Brotman <gary@marqueelaw.com>

Hello Mr. Brotman,

I apologize for the delay. Please be advised the rough draft was sent to  Mr. Kevin Jackson on 02/08/24 at 12:12pm. Please let me know if you need anything further.

Thank you.


Best Regards,

**Alisa Boyadzhyan**
**Client Services Specialist**
Aptus Court Reporting

**Phone:** 866.999.8310
**Web:** www.aptuscr.com

# EXHIBIT C

4    managers that's out of the field to understand and go

5    out there and observe you know what they tell me is to

6    make a judgment in regards to what is needs to be made.

7        Q.   In the situations that you identify where you

8    were involved in the decision-making process to

9    terminate the employment of it sounds like two

10    individuals, can you describe what that process was

11    like?

12        A.   One of the issues that led to termination of

13    one of the employees was an FAA violation where they

14    call it blocking the deadman.  A deadman is a switch

15    that controls or activities a pump.  Blocking it

16    requires, you know jamming a piece of wire whatsoever to

17    it keeps on -- keeps on basically.  And FAA rules that's

18    a violation and it's terminal offense.  So that's pretty

19    much -- pretty much self explanatory.

20        Tracy -- I was working with Tracy in regards

21    to that to get all the documentation.  I got CCPD

22    purchases from the tank farm the fuel farm itself

23    when --

24        (Reporter requests clarification.)

25    ///

81

1    BY MR. JACKSON:

2        Q.   Is that Tracy Aguilera?

3        A.   I'm sorry, Tracy Aguilera.

4            You confused me as well.

5        Q.   The same Tracy you were just discussing that's

6    the same Tracy Aguilera who is the defendant in this

7    case; correct?

8        A.   Correct.

9        Q.   And so it sounds like you had with respect to

10   that termination an opportunity to work directly with

11   Tracy in connection with that personnel decision?

12       A.   Right.

13       Q.   And what was your opinion of Tracy's you know

14   professionalism when it came to assisting in that

15   termination decision?

16          MR. BROTMAN:  Objection calls for speculation,

17     calls for a legal conclusion.

18          THE WITNESS:  So when that had happened Tracy

19     gave me recommendations of what -- what could we do.

20     She also put on a side note that is there anyway we can

21     safe this employee.  Because one this employee that was

22     getting terminated was a shop union rep for the company

23     and I pretty much had to follow by the rules of you know

24     FAA violations, FAA violations.  You know you have too

25     many parties that's involved with this.  You have the

82

1     fuel farm -- fuel farm general manager which is -- is

2     one that provides immediate CCTB and every time those

3     incidents got to be reported to FAA so they know what's

4     going on.  I made a judgment call of there's no way we

5    can save this individual.  So therefore the termination

6    stands.

7       Q.   Okay.  And in your opinion was -- did Tracy

8    handle that decision-making process in a fair manner?

9            MR. BROTMAN:  Objection calls for speculation,

10   vague and ambiguous as to fair.  Calls for expert

11   opinion.

12           THE WITNESS:  So Tracy basically had the

13   process that I told her.  Because at the end of the day

14   I am in charge of this station.

15           MR. JACKSON:  Okay.  So when you were working

16   with Tracy for that termination ultimately it was your

17   decision and Tracy had to do what you instructed her to

18   do.

19       Q.   Is that your testimony?

20       A.   Correct.

21       Q.   Okay.  And so then after that, if Tracy

22   communicated the decision to the employee she would be

23   communicating what presumably you had guided her to do;

24   is that correct?

25           MR. BROTMAN:  Objection assumes facts.

83

1    Incomplete hypothetical.

2         THE WITNESS:  Can you rephrase that?

3         MR. JACKSON:  Let me ask a different question.

4    Q.   Did you -- when the termination decision was

5    made who communicated that decision to the employee to

6    your knowledge?

7    A.   So after we have a meeting with tray so I what

8    is there to do in the process.

9    Q.   Yeah, what happened.  How did the employee

10    come to learn that he or she had been terminated?

11    A.   We had a meeting with the individual and we

12    sat the individual down and explained to them, you know,

13    this is the rules.  We are basing your termination off

14    on this -- what you call the evidence that we have at

15    hand.

16    Q.   And who attended that meeting?  I don't know

17    the name of this employee was but was it you and Tracy?

18        A.  Me, Tracy and one other shop rep.

19        Q.  Okay.  And in that meeting you said you were

20    basically -- everything you just said turn communicating

21    to the employee about the reasons for the decision and

22    the rules about why the company did what it did?

23        A.  Right.

24        Q.  Is that correct?

25        A.  Correct.

84

1        Q.  Did Tracy communicate any of the same to the

2    employee or was it just you?

3        A.  We both did.  We were both at that meeting

4    when the final decision.

5        Q.  Okay.  And in your view were those

6     communications made in the ordinary course of performing

7     your jobs as managers for Menzies?

8          A.   I'm sorry?

9          Q.   So the meeting you just described where you

10    and Tracy were communicating the company's termination

11    decision to the employee, do you agree that that was

12    just part of your and Tracy's job was to communicate

13    Menzies' decision to the employee at that meeting?

14         A.   Yes.

15         Q.   You would agree that that's just an ordinary

16    function that a manager in your position and in Tracy's

17    position performed for Menzies?

18         A.   Yes.

19             MR. BROTMAN:  Objection compound, calls for

20    speculation.

21    BY MR. JACKSON:

22         Q.   You said you communicated a lot to the

23    employee during that meeting, but in your mind was your

24    decision to terminate the employee based on company

25    policy?

85

1    A.  Yes.

2    Q.  And ultimately did you come to the opinion

3    that Tracy agreed with your decision that termination

4    was justified based on company policy?

5         MR. BROTMAN:  Objection calls for speculation

6    as to what Tracy thought.

7         THE WITNESS:  Was this the final meeting with

8    the employee or just a meeting that I have with Tracy

9    and the training managers.

10    BY MR. JACKSON:

11    Q.  I was just referring to the termination

12    meeting we were just talking about?

13    A.  If you are talking about the termination with

14    the employee happened with the final meeting with them.

15    Yes, its my position based on all the evidenced I

16    gathered and the company policy and the FAA violation,

17    as well.

19    make that clear.

20        So going back a little bit before we went on

21    break we were talking about I believe the Exhibit 6 was

22    the February 10th, 2022 email; right?

23    A.  Right.

24    Q.  And we were talking about before that time in

25    connection with your employment and position as the

88

1    general manager you would have some occasion to work

2    directly with Tracy Aguilera with respect to at least

3    one termination decision.

4        Is that correct?

5    A.  Two.  A total of two, that I remember.

6    Q.  Two.

7        Can you describe the other termination that we

8    talked about earlier and you were interactions with

9    Tracy in connection with that?

10    A.  The other termination was due to attendance

11    issues of personnel.  Nothing against his what you say,

12    personality.  It was more his absence or tardiness

13    affecting our operations and pretty much trying to

14    follow the company policy in regards to attendance

15    policy was adhered and attendance issues with this

16    employee based on cause.

17    Q.   Was that your decision?

18    A.   Yes, following company policy attendance

19    policy.

20    Q.  And --

21    A.  And there was --

22    Q.  Go ahead.

23    A.  -- there was a time that I have meetings with

24    Tracy and also during that time with the training

25    manager as well to discuss about employee that's going

89

1    to be terminated.

2         Tracy was asking is there anything we can do

3    to save this individual.  I told Tracy straight up a

4    adhering with the company's attendance policy, this guy

5    violated a lot of issues and, you know, I made the

6    decision to let him go.

7         Q.  And then did you instruct Tracy to proceed

8    with processing the termination based on your decision?

9         A.  Correct.

10        Q.  And did she fulfill your requests?

11        A.  Yes.

12        Q.  And in fulfilling your requests do you agree

13    that that was part of what her job function in human

14    resources required her to do?

15        MR. BROTMAN:  Objection may call for

16    speculation.

17        THE WITNESS:  Yes.

18    BY MR. JACKSON:

19        Q.  And did you then or sitting here now take any

20    issue with how Tracy performed her human resources

21    function in connection with that termination?

22        A.  Before the termination she was asking, you

23    know, can we give each of them a second chance.  And she

24    knows that there is no second chances to be given.

25        Q.  Okay.  So she was looking for a way to give

90

1    the employee a second chance and you said no and then

2    instructed her to proceed with the termination.

3            Is that correct?

4        A.  Correct.

5        Q.  And so in so processing that termination and

6    in your view Tracy was doing what she was supposed to do

7    based on your direction to her; correct?

8        A.  Right.

12    direct communications with Tracy Aguilera regarding your

13    medical condition?

14        A.  That, I don't recall.

15        Q.  Did you have -- strike that.

16            Prior to February 10th, 2022, did you have any

17    communications with Tracy Aguilera about your need to

18    have time off to have surgery?

19        A.  I don't recall.

20        Q.  To the best of your recollection is the only

21    person you spoke with at Menzies about your need for

22    time off in February 2022, was that Kevin Lager?

23        A.  Yes, because he was the boss.  Tracy doesn't

24    have anything to do with decision-making, whatsoever.

25    Kevin is the one that has the decision-making.

97

1        Q.  All right.

1    a non FMLA medical leave which is not a job protected

2    absence and does not provide a job restoration rights.

3        A.  Yes.

4        Q.  You understood that?

5        A.  Yes.

6        Q.  And the letter said I do understood that at

7    the time; correct?

8        A.  Yes.

9        Q.  It goes on to state upon the expiration of the

10   leave you may be returned to your former position based

11   on business needs and availability; correct?

12       A.  Yes.

13       Q.  So at the time you received this letter in

14   April of 2022, was it your understanding that starting

15   on May 7th you would be on a non FMLA CFRA leave that

16   did not have job protection rights and that you will

17   return your former position was not guaranteed?

18       A.  Yes.

19       Q.  Okay.  And again it's your testimony that at

20   this time that you were receiving this email you were

21   taking no issue with how Menzies responded to your

22   requests for time off or classified your requests for

152

1    she said Michael Porier or company finds that there's no

2    longer a need of a general manager at SFO because they

3    have operation manager, they have additional account

4    manager.

5        Q.   Okay.  And did Tracy say anything to you

6    during that discussion to indicate that Menzies decision

7    was based on your medical condition?

8        A.  No.

9        Q.   And during that conversation did Tracy say

10    anything to you to indicate that Menzies decision was

11    based on your leave of absence?

12        A.   No.

13        Q.   And other than Tracy's statement that the

14    company determined that there was no longer a need for

15    the general manager position had eliminated it at SFO

16    did she tell you anything else regarding Menzies reasons

17    for its decision?

18      A.  No.

19      Q.   Sitting here today, do you know why Menzies

20   made the decision to eliminate the general manager

21   position at SFO?

22      A.  I have no include.

23      Q.   Are there any -- strike that.

24        Has anybody from Menzies communicated anything

25   to you in writing or verbally to contradict the reason

153

1   that Tracy identified in her meeting with you on

2   December 20th 2022 as to why Menzies eliminated the

3   general manager position at SFO?

4        MR. BROTMAN:  Objection leading.

5        THE WITNESS:  No.

6   BY MR. JACKSON:

7      Q.   And during this meeting Tracy informed you for

154

1    BY MR. JACKSON:

2        Q.  Just so I'm clear.

3            You have no information to suggest that there

4    were other positions open that she concealed from you

5    during that meeting on December 20th, 2022; correct?

6        A.  Not quite sure.  She only gave me those two

7    job listing aircraft fueler and cargo.  To me that does

8    not make sense.

9        Q.  My question is simp -- my question is simply:

10    Other than those two positions are you aware of whether

11    there were other positions available at the SFO station

12    as of December 20th, 2022?

13            MR. BROTMAN:  Objection asked and answered.

14            THE WITNESS:  I don't know.

15        Q.  After Tracy informed you of those two open

16    positions, you responded with, you know, what you

17    testified to before essentially that they were, you

18    know, significantly lower paying and you know several

19    steps down from the general manager position; correct?

20        A.   That is correct.

21        Q.   And then you inquired with her about open

22    management positions at other locations other than SFO;

23    correct?

24        A.   Correct.

25        Q.   And then how did Tracy respond to that

155

1    request?

2        A.   She draft me a list of what she could find

3    out.  She also mentioned that there is no guarantee, no

4    relocation fee for me and also gave me a deadline of

5    three days to think about it.  Three days not enough to

6    think about to talk to my family, to make that move.

7    That's a gamble, too.

8        Q.   Well?

10    law protects you from your status.

11        Q.   But you understood at this time that you had

12    been on an unprotected medical leave of absence for the

13    entire period of time since your FMLA CFRA leave expired

14    in May of 2022, correct.

15        MR. BROTMAN:  Objection calls for a legal

16    conclusion.

17        THE WITNESS:  As I mentioned before after

18    receiving those many letters it doesn't really apply

19    because I haven't seen anybody that have a different

20    position after extended leave.  Especially in my case in

21    my position as GM.  They just don't leave -- you don't

22    get rid of GM just like that.

23        I'm not a regular agent which is replaceable.

24        Q.   Okay.  But you understood that Menzies had

25    communicated to you since prior to ahead of the time

158

1    your FMLA CFRA leave had expired in May of 2022 the

2    company was extending your leave of absence pursuant to

3    a medical leave of absence policy that was not job

4    protected.

5         That was communicated to you multiple times;

6    correct?

7    A.  Yes.

8    Q.  Okay.  And looking at this email do you find

9    this to be an appropriate communication with your

10   employer?

11        MR. BROTMAN:  Objection vague and ambiguous.

12        THE WITNESS:  I believe so.

13   BY MR. JACKSON:

14   Q.  And you understood that Menzies was offering

15   you all of the positions at SFO to which you responded

16   this is an insane job offer; correct?

17        MR. BROTMAN:  Objection mischaracterizes the

18   testimony.

19        THE WITNESS:  Yes.

20   Q.  And you were demanding your job back as GM;

11    employment attorney?

12       A.  Not yet.

13       Q.   And then you state mean while I shall oblige

14    you by attending the scheduled meeting on December 28th,

15    2022; correct?

16       A.  Correct.

17       Q.   By way of this communication were you in your

18    mind clearly communicating that you would not accept the

19    open positions that were available at SFO?

20       A.  Actually accept.

21       Q.   Right.  So you were turning down the work that

22    Menzies informed you was available at this time at SFO;

23    correct?

24       A.  Yes.

25          MR. JACKSON:  I'd like to introduce an Exhibit

4      A.  Correct.

5      Q.  So the email goes on to say I have looked at

6   the other positions more in line with your previous

7   position in the Menzies network that you can apply and

8   may be considered.

9          Do you see that?

10      A.  Yes.

11      Q.  And is that consistent with your understanding

12   that after you asked Tracy about other positions she

13   looked into them, there were nor management level across

14   the Menzies network and then identified four such

15   positions that would be available now?

16      A.  She only sent this as it was requested a week

17   later and I had three days from that time to make a

18   decision to see if I can move and like I say there's no

19   relocation funds.  How can that be?

20      Q.  My question was simply:  In response to your

21   requests to look at positions outside of SFO that were

22   more equivalent to the management position you held,

23   Tracy looked at open positions and provided these four

24   in response to your requests; is that correct?

25          MR. BROTMAN:  Objection asked and answered.

169

1    Again.

2          THE WITNESS:  Yeah.  She only gave me these

3    positions when I asked for it.  It's not offered to me.

4    Q.  I --

5    A.  To begin with.

6    Q.  I -- my question is simply:  In response to

7    your request did Tracy identify open positions in the

8    Menzies network that were more equivalent to the

9    management position you held; yes or no?

10     A.  Objection asked and answered.  Again,

11   harassing at this point.

12        No, I'm telling you.  These are -- these are

13   positions that I was not offered to me to begin with.  I

14   had to ask for it.

15     Q.  Sir, my question is not whether you were

5      Q.  No problem.

6      A.  Can you name the file name that you shared?

7      Q.  Yeah, it's Tab 16 in the chat.  It says

8    10:34 a.m.

9      A.  Tab 16 complaint and you talked about what

10   line?  I'm sorry.

11     Q.  I just wanted to see if you added it in front

12   of you.

13     A.  Yeah, I have it in front of me.

14     Q.  All right I want you to look at paragraph 53,

15   please?

16     A.  Fifty-three.

17        Okay.

18        As described herein.

19     Q.  Yeah.  Okay starting online 24 it states

20   defendants actions Aguilar acting in her capacity as ASI

21   Menzies including one stopped to obstruct plans to

22   return to work.

23        Do you see that?

24     A.  Yes.

25        And what specifically in your view constituted

192

1    Tracy's efforts to obstruct your return to work.

2         MR. BROTMAN:  Objection calls for a legal

3    contention pursuant to writ in the superior court.

4         THE WITNESS:  She used to word voluntary

5    resignation every time I felt threaten because I don't

6    resign at all or voluntarily resign.

7         Q.   Okay.  Other than Tracy's statements about

8    voluntary resignation is there anything else that she

9    said that made you feel threatened?

10        A.   No, just only voluntary resignation every

11   time.

12        Q.   And those were written communications that

13   we've look at today during your deposition?

14        A.   That is correct.

15        Q.   And is it your belief that Tracy made the

16    decision to separate your employment from Menzies?

17        A.  I believe she has to do whatever the boss

18    says, right?  So it is not her decision but then it is

19    how -- how it was explained to me, I feel threatened.

20    Voluntary resignation.  You voluntary resign.  Which I

21    don't resign.

22        Q.   Do you know whether Tracy was instructed by

23    anybody else to classify your termination as a voluntary

24    resignation?

25        A.   That I'm not sure.  We all have different

193

1    bosses.

2        Q.   But ultimately it is your testimony that you

3    don't think Tracy was the one that made the decision.

4    She was just performing her job as the human resources

5    manager in communicating with you?

6         MR. BROTMAN:  Objection misstates the

7     testimony.  Leading.

8         THE WITNESS:  Yeah, I don't know.

9     BY MR. JACKSON:

10        Q.   Well, is there any reason for you to believe

11    that she was acting outside of her capacity as a human

12    resources manager during her communications with you?

13        MR. BROTMAN:  Objection calls for speculation

14    as to her capacity as a human resources manager.

15        THE WITNESS:  I don't know.

16    BY MR. JACKSON:

17        Q.   Are you familiar with Tracy's complete job

18    description?

19        A.   She handles all the difficulties and all the

20    humans relationship with all the employees so to speak.

21        Q.   And other than that, do you have personal

22    knowledge of specific job duties and responsibilities

23    that Tracy Aguilera holds in her capacity at Menzies?

24        A.   Not too familiar because she is not under my

25    supervisor.  So I really don't know.  I know she has a

# EXHIBIT D




# E-SERVICE: Geary Sha v. Aircraft Service International, Inc. et al.

**Gary Brotman** <Gary@marqueelaw.com>                    Fri, Dec 22, 2023 at 5:14 PM
To: "Jackson, Kevin" <kjackson@foley.com>
Cc: Yessi Chinchilla <yessi@marqueelaw.com>, Marquee Law Group APC Service <service@marqueelaw.com>, Diego
Gallego Gomez <diego@marqueelaw.com>, Brady Borrayo <brady@marqueelaw.com>, Claudia Perez
<claudia@marqueelaw.com>, "Lawther, Will" <WLawther@foley.com>, "Ward, Christopher" <CWard@foley.com>,
"Moreno, Sonia" <SMoreno@foley.com>

Kevin,

Can you do February 6, 2024 for Plaintiff's deposition? I am also attaching a draft of our deposition notice for ASI's
person most knowledgeable. Please let me know who the deponent or deponents would be for each category and
their availability for deposition.

Regards,

**Gary Brotman**  |  MARQUEE LAW GROUP, A.P.C.
Attorney
9100 Wilshire Blvd., Suite 445 East Tower
Beverly Hills, CA 90212
gary@marqueelaw.com
T: (310) 275-1844 | F: (310) 275-1801

--------------------------------------------------------------------------
**Privileged and Confidential** information may be contained in this message. If you are not the addressee indicated in this message (or Responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer does not consent to Internet email for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of my firm shall be understood as neither given nor endorsed by it. **IRS Circular 230 Disclosure:** To ensure compliance with Treasury Department Regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

[Quoted text hidden]

 **G. Sha PMK Depo Notice (ASI).pdf**
136K



---

## E-SERVICE: Geary Sha v. Aircraft Service International, Inc. et al.

**Gary Brotman** <Gary@marqueelaw.com>                     Fri, Feb 23, 2024 at 2:58 PM
To: "Jackson, Kevin" <kjackson@foley.com>
Cc: Yessi Chinchilla <yessi@marqueelaw.com>, Marquee Law Group APC Service <service@marqueelaw.com>, Diego
Gallego Gomez <diego@marqueelaw.com>, Brady Borrayo <brady@marqueelaw.com>, Claudia Perez
<claudia@marqueelaw.com>, "Lawther, Will" <WLawther@foley.com>, "Ward, Christopher" <CWard@foley.com>,
"Moreno, Sonia" <SMoreno@foley.com>

Kevin,

I don't know that we are going to agree to giving you another date with our client after you had an entire day and
before I take a single PMK deposition. I don't see any basis in law or professional courtesy when I have been asking
for the PMK since December with nothing in return. I suggest we start with Defendant identifying how many PMK
deponents there will be, and which topics they will cover, and we can take it from there.

I am still thinking about late March or early April.

**Gary Brotman** | MARQUEE LAW GROUP, A.P.C.
Senior Attorney
9100 Wilshire Blvd., Suite 445 East Tower
Beverly Hills, CA 90212
gary@marqueelaw.com
T: (310) 275-1844 | F: (310) 275-1801

------------------------------------------------------------------------
**Privileged and Confidential** information may be contained in this message. If you are not the addressee indicated in this message (or Responsible for
delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly
notify the sender by reply email. Please advise immediately if you or your employer does not consent to Internet email for messages of this kind.
Opinions, conclusions and other information in this message that do not relate to the official business of my firm shall be understood as neither given nor
endorsed by it. **IRS Circular 230 Disclosure:** To ensure compliance with Treasury Department Regulations, we advise you that, unless otherwise
expressly indicated, any federal tax advice contained in this communication was not intended or written to be used, and cannot be used, for the purpose
of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or
recommending to another party any tax-related matter addressed herein.

[Quoted text hidden]




## E-SERVICE: Geary Sha v. Aircraft Service International, Inc. et al.

**Jackson, Kevin** <kjackson@foley.com>                                    Fri, Feb 23, 2024 at 3:00 PM
To: Gary Brotman <Gary@marqueelaw.com>
Cc: Yessi Chinchilla <yessi@marqueelaw.com>, Marquee Law Group APC Service <service@marqueelaw.com>, Diego Gallego Gomez <diego@marqueelaw.com>, Brady Borrayo <brady@marqueelaw.com>, Claudia Perez <claudia@marqueelaw.com>, "Lawther, Will" <WLawther@foley.com>, "Ward, Christopher" <CWard@foley.com>, "Moreno, Sonia" <SMoreno@foley.com>

Hi Gary, I am not trying to create an unnecessary dispute here, but we noticed plaintiff's deposition well in advance of receiving your draft PMK notice and I don't believe I saw any follow up until after plaintiff's deposition. It is not just that we have had one day, we are in the middle of a deposition, and it would not be appropriate for plaintiff to take a deposition and then reconvene his date. Like I said, we are happy to coordinate them and even allow them to run back to back on consecutive days, but we believe we are entitled to complete his deposition first.

I'll be in touch with dates soon.

**Kevin Jackson**
*Senior Counsel*

Foley & Lardner LLP
11988 El Camino Real
Suite 400
San Diego, CA 92130-2594

P 858.847.6734

Visit Foley.com

---

**From:** Gary Brotman <Gary@marqueelaw.com>
**Sent:** Friday, February 23, 2024 2:58:06 PM
**To:** Jackson, Kevin <kjackson@foley.com>
[Quoted text hidden]

[Quoted text hidden]




## E-SERVICE: Geary Sha v. Aircraft Service International, Inc. et al.

**Gary Brotman** <Gary@marqueelaw.com>                    Fri, Feb 23, 2024 at 3:10 PM
To: "Jackson, Kevin" <kjackson@foley.com>
Cc: Yessi Chinchilla <yessi@marqueelaw.com>, Marquee Law Group APC Service <service@marqueelaw.com>, Diego Gallego Gomez <diego@marqueelaw.com>, Brady Borrayo <brady@marqueelaw.com>, Claudia Perez <claudia@marqueelaw.com>, "Lawther, Will" <WLawther@foley.com>, "Ward, Christopher" <CWard@foley.com>, "Moreno, Sonia" <SMoreno@foley.com>

Kevin,

It certainly seems pretty unnecessary. I find it hard to believe that you are in the middle of his deposition after you had an entire 8 hours with my client and went through the timeline of facts up through his termination. How much more time do you anticipate needing?

It is not appropriate for you to withhold your client's depositions because you weren't able to finish in a full day. I could have unilaterally noticed a deposition back in December the same way you did but chose to work with you in good faith by sending you the list of topics first. It now appears that you are refusing to confer in good faith. I will need to know the identity of the pmk deponents and the topics they will each cover before we take this any further. You should have been able to obtain this information in the last 2 months.

**Gary Brotman** | MARQUEE LAW GROUP, A.P.C.
Senior Attorney
9100 Wilshire Blvd., Suite 445 East Tower
Beverly Hills, CA 90212
gary@marqueelaw.com
T: (310) 275-1844 | F: (310) 275-1801

------------------------------------------------------------------------
**Privileged and Confidential** information may be contained in this message. If you are not the addressee indicated in this message (or Responsible for delivery of the message to such person), you may not copy or deliver this message to anyone. In such case, you should destroy this message and kindly notify the sender by reply email. Please advise immediately if you or your employer does not consent to Internet email for messages of this kind. Opinions, conclusions and other information in this message that do not relate to the official business of my firm shall be understood as neither given nor endorsed by it. **IRS Circular 230 Disclosure:** To ensure compliance with Treasury Department Regulations, we advise you that, unless otherwise expressly indicated, any federal tax advice contained in this communication was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code or applicable state or local tax law provisions or (ii) promoting, marketing or recommending to another party any tax-related matter addressed herein.

[Quoted text hidden]